IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIKHAEL VLASOV,<br><br>                    Petitioner,<br><br>     vs.<br><br>D. URIBE, JR., Warden,<br><br>                    Respondent. | Case No. 2:09-cv-01322-JKS<br><br><br>MEMORANDUM DECISION |

Petitioner, Mikhael Vlasov, a state petitioner proceeding *pro se*, has filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254.  Vlasov is currently in the custody of the California Department of Corrections, incarcerated at the California State Prison, Centinela in Imperial, California.  Respondent has filed an answer.  Vlasov has not filed a traverse.

<u>STATEMENT OF THE FACTS</u>[1]

<u>Factual and Procedural Summary</u>

[Vlasov] was tried twice for the murder of Chung during a failed carjacking—with the first trial ending in a mistrial after the jury deadlocked, and the second trial resulting in a conviction on all counts.

At the first trial, he was tried jointly with co-defendant Daniil Zhuk, who testified and tried to cast blame for the murder on [Vlasov]. In so doing, Zhuk challenged [Vlasov] to testify and tell the truth, and also accused [Vlasov] of an uncharged attempted carjacking of Amado Lopez's car at an Albertson's store.

The defense was [Vlasov] did not have the specific intent to commit the charged crimes, in that his limited intelligence caused him to be easily influenced by Zhuk, the true mastermind. Regarding the uncharged Lopez incident, [Vlasov] testified Zhuk told him what to do, and [Vlasov] blindly followed instructions because he felt coerced. He admitted the uncharged Lopez offense in an effort to show that he was testifying truthfully, and to demonstrate that Zhuk was the one in charge. The tactic was somewhat successful because the jury convicted Zhuk of all charges, but was unable to reach a verdict regarding [Vlasov 's] guilt on all but one charge involving Chung's father. The prosecution then charged [Vlasov] in case No. 04F11052 with the attempted kidnapping of Lopez to commit a robbery and with assaulting Lopez with a semiautomatic weapon. The Lopez charges were consolidated with case no. 00F02479, which charged [Vlasov] with the murder of Chung in the commission of an attempted robbery and carjacking, and with attempted carjacking and attempted robbery. A summary of the evidence presented at the second trial follows:

<u>The Murder of Chung</u>

On January 20, 2000, Zhuk, 14-year-old Peter P., and [Vlasov] were cruising in Zhuk's car. Zhuk told them that he knew someone who would pay them $4,000 for a BMW or Mercedes. While driving along Interstate 5, Zhuk saw a white BMW that he decided to steal and followed the car.

Cindy Chung was driving the BMW to her father's business to do some work for him. Chung was a bookkeeper for a construction company but occasionally helped her father with bookkeeping for his business, an automobile body shop on Croydon Way in Rancho Cordova.

Zhuk, Peter P., and [Vlasov] followed the BMW to a commercial building on Croydon Way, where they lost sight of the car. Zhuk parked nearby, gave [Vlasov] a handgun, and told him to go look for the car. Zhuk also tried to involve Peter P. in the crime, but Peter P. declined; he even told Zhuk they should not steal the BMW, to which Zhuk responded, "shut up you little guy.

---

[1] The following facts are taken verbatim from the opinion of the California Court of Appeal, Third Appellate District. (Lodged Doc. No. 1).  Under the Antiterrorism and Effective Death Penalty Act, the determination of these facts is presumed to be correct, and Vlasov has the burden of rebutting that presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

[Vlasov] got out of the car and headed in the direction of the BMW. He went past a dumpster but did not see the car. After urinating in the waste container, he returned to Zhuk's car and explained that he could not find the BMW. Zhuk began to drive away with Peter P. and [Vlasov], but returned and parked in the same spot. Zhuk told [Vlasov] to "go take the car." When [Vlasov] refused, Zhuk began "cussing [him]" and said he would kick [Vlasov] in the head and tell his friends he was "not good." Zhuk called him a "pederaste"—which is "real bad" in Russian— and a condom.

[Vlasov's] testimony from the first trial was introduced at the second trial. [Vlasov] admitted taking the handgun and deciding to steal the BMW because Zhuk told him he would knock him in the head. He did not want Zhuk to tell his friends he was a pederaste or a condom. He gave no other reason for his failure to refuse to participate in the carjacking.

[Vlasov], who was armed, headed off in the same direction as before. This time, he saw an Asian man, Chung's father, near the dumpster. Observing the white BMW backing up in the parking lot, [Vlasov] went toward the car, stopping about three feet away. As the car continued to move, [Vlasov] fired a shot through the driver's window, killing Chung. He then ran toward Zhuk's car and fired three shots in Mr. Chung's direction. [Vlasov] jumped in the car and told Zhuk and Peter P., "I didn't get the car because she wouldn't give it up. She stepped on the gas and I shot her."

Two months after Chung's death, Zhuk left a recorded message with the Sacramento County Sheriff's Department saying that he had information about the homicide. After speaking with Zhuk, detectives contacted [Vlasov]. At first, [Vlasov] denied any knowledge of the murder but then said that Zhuk had killed Chung. [Vlasov] eventually admitted he shot Chung, saying the devil made him do it.

The Attempted Kidnapping of Lopez

On the night of January 29, 2000, Amado Lopez was sitting in his car while on a break from his job at a grocery store. Two men, later identified as Nickolay Zaychenko and [Vlasov], came up to the car. Zaychenko knocked on the window and asked for a cigarette. When Lopez refused, Zaychenko displayed a handgun and Lopez complied with an order to get out of the car. Zaychenko took Lopez's cell phone and wallet while [Vlasov] pointed a knife at Lopez.

Zaychenko obtained Lopez's car keys and told him to get in the car with Zaychenko and [Vlasov]. When Zaychenko was unable to start the car, Lopez managed to escape. He ran into the grocery store and yelled for help. Lopez and a coworker ran back out and chased the culprits, whereupon one of the carjackers fired a gun in the air. Lopez and his coworker ran back into the store.

Zhuk's testimony from the first trial was read to the jury. He claimed he, Zaychenko, and [Vlasov] were cruising around and stopped at the grocery store to buy vodka and cigarettes. Zhuk, who stayed in the vehicle, saw [Vlasov] and Zaychenko talking to someone in the parking lot. The person ran into the store and, when the person ran back out with other people, [Vlasov] shot a gun in the air.

[Vlasov's] testimony from the first trial also was read to the jury. According to [Vlasov], Zhuk instructed him and Zaychenko to rob Lopez and steal the car. Zaychenko gave [Vlasov] a gun and told him to point it at Lopez. [Vlasov] fired the handgun as they ran from the scene, but he did not know if the discharge was accidental. The handgun was the same one he had used to kill Chung.

Defense

[Vlasov] was born in Uzbekistan and moved to the United States when he was around 16 years old. He had an IQ between 60 and 64, with deficits in multiple areas of adaptive functioning. According to a defense expert, persons who suffer from mental retardation, like [Vlasov], tend to agree to everything and lack the ability to predict the outcome of their actions.

[Vlasov], who was 18 years old when he murdered Chung, testified he associated with 17-year-old Zhuk because he wanted a friend. [Vlasov] first met Zhuk in 1999, about five months prior to his arrest in this case. [Vlasov], who had never stolen before, helped Zhuk break into cars and steal stereos. He went along with Zhuk because Zhuk was [Vlasov's] only friend. [Vlasov's] family tried unsuccessfully to keep him away from Zhuk.

[Vlasov] claimed Zhuk was "mean" when [Vlasov] told him he could not find Chung's BMW. Zhuk threatened to bash [Vlasov's] head or smash his face if he did not steal the car, and he forced [Vlasov] to take the handgun. Denying he intended to fire the gun, [Vlasov] claimed he did not know how the gun discharged. He admitted initially lying to detectives about the Chung murder because he did not want to get into trouble.

Regarding the Lopez offenses, [Vlasov] stated it was Zhuk's idea to steal the vehicle. [Vlasov] denied that he was armed with a knife or that he intended to kidnap Lopez. He admitted shooting the handgun in the air as they ran back to Zhuk's car.

During closing argument, defense counsel argued [Vlasov's] mental retardation affected his ability to form the requisite specific intent to commit the felonies underlying Chung's felony-murder because [Vlasov's] impaired thinking caused him to attach himself to Zhuk, who had a dominant personality. [Vlasov] could not say no to Zhuk, who pressured him into committing the crime, and Zhuk was able to do so because of [Vlasov's] limited mental abilities, which prevented him from making appropriate choices.

PROCEDURAL HISTORY

A jury convicted Vlasov of:  first-degree, felony murder of Cindy Chung during the commission of an attempted carjacking; attempted kidnapping of Amado Lopez to commit robbery; attempted robbery; attempted carjacking, and; assault with a firearm.  The jury found true various firearm enhancements, including the charge that Vlasov personally and intentionally discharged a firearm in the commission of Chung's murder and the attempted kidnaping of Lopez.  Vlasov was sentenced to state prison for life without parole for the murder of Chung, plus 25 years to life for the intentional use of a firearm in committing that offense, and an indeterminate term of 27 years to life for the remaining charges.

Vlasov timely appealed his conviction to the California Court of Appeals for the Third Appellate District. On November 20, 2007, the Appellate Court affirmed the judgment in its entirety in a reasoned, unpublished decision.[2] Vlasov then filed a petition for review in the California Supreme Court, which denied review February 13, 2008.[3]

Vlasov timely filed a petition for habeas corpus in this Court on May 13, 2009. In his petition, Vlasov raises three claims for relief: the trial court erred by excluding expert testimony regarding "traumatic bonding"; the trial court erred by not instructing the jury on the defense of duress, and; the evidence was insufficient to support the finding that Vlasov intentionally discharged a firearm. Respondent does not assert any affirmative defenses and concedes that Vlasov's claims are properly exhausted.

STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[4] The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[5] The holding must also be intended to be binding upon the

---

[2] Lodged Doc. No. 1.

[3] Lodged Doc. No. 2.

[4] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[5] *Williams*, 529 U.S. at 412.

states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.[6] Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[7] When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must be objectively unreasonable, not just incorrect or erroneous.[8] The Supreme Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing that the state court determination was incorrect.[9] "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[10] In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state-court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[11] Because state court judgments of

---

[6] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[7] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations by the Court); *see Wright v. Van Patten*, 552 U.S. 120, 127 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[8] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[9] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[10] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[11] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[12]

In applying this standard, this Court reviews the last reasoned decision by the state court.[13] State appellate court decisions that affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[14] Under California's unique habeas procedure, a defendant who is denied habeas relief in the superior court files a new original petition for relief in the California Court of Appeals. If denied relief by the Court of Appeals the defendant has the option of either filing a new original petition for habeas relief or a petition for review of the Court of Appeal's denial in the California Supreme Court.[15] This is considered as the functional equivalent of the appeal process.[16] Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[17] This presumption applies to state trial courts and appellate courts alike.[18]

## DISCUSSION

---

[12] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[13] *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004).

[14] *Ylst*, 501 U.S. at 802-03.

[15] *See Carey v. Saffold*, 536 U.S. 214, 221-22 (2002).

[16] *Id.* at 222.

[17] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[18] *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

As noted above, Vlasov asserts three grounds for relief.  This Court will discuss each of them in the order raised.

### Exclusion of Expert Testimony Regarding "Traumatic Bonding"

Vlasov claims the trial court violated his Fifth and Fourteenth Amendment rights by excluding expert testimony regarding his relationship with co-defendant Daniil Zhuk. Specifically, Vlasov claims that he was the victim of "traumatic bonding," a condition which left him susceptible to being controlled by Zhuk.  Vlasov asserts that the expert testimony regarding "traumatic bonding" was crucial to help the jury understand that he did not form the specific intent to carjack Ms. Chung and the other mental states at issue.  The California Court of Appeals rejected this claim on the merits:

> The admission of expert testimony is subject to the requirement that it be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)  In addition, the testimony must be relevant to an  issue at trial, as only relevant evidence is admissible. (Evid. Code, § 350; *People v. Heard* (2003) 31 Cal.4th 946, 972.)  "Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  The test of relevance is whether the evidence tends '"logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.]" (*People v. Scheid* (1997) 16 Cal.4th 1, 13-14.)  A trial court's exercise of discretion in admitting or excluding evidence, including expert testimony, is reviewable for abuse of discretion. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1118; *People v. Alvarez* (1996) 14 Cal.4th 155, 201.)
> At an Evidence Code section 402 hearing, Linda Barnard, who has a Ph.D. in counseling and works with trauma survivors, discussed traumatic bonding.  It is not a diagnosis but a characteristic of a relationship in which one person has a position of authority or control over another person, and there is intermittent harassment, verbal abuse, or physical abuse interspersed with kindness by the controlling person.  The recipient feels controlled and fearful, but simultaneously cares about the dominant person because of the intermittent kindness.  He does what he is told to do, otherwise the controller might become violent or abusive.  The recipient knows right from wrong but is susceptible to being controlled by the other person. A person who is less intelligent has a greater susceptibility to forming a traumatic bond and a greater desire to please the dominant person. Barnard opined that [Vlasov] was traumatically bonded with Zhuk and feared he would suffer harm if he did not follow Zhuk's orders.

Barnard conceded she had never studied the dynamics between criminal partners, including the dynamics and techniques of control by leaders and followers in criminal partnerships. Barnard also acknowledged her testimony would not promote a duress defense; she simply was "providing information about the context in which this event occurred." In addition, Barnard was not assessing [Vlasov's] capacity to form a specific intent, which was a question outside her area of expertise. She typically testified about traumatic bonding in the context of domestic violence but had never "testified about it in a case exactly like this."

Defense counsel argued Barnard's testimony was relevant to establish that [Vlasov] was coerced into committing the Chung robbery and that he did not share Zhuk's specific intent with respect to the felony underlying Chung's murder or with respect to the attempted carjacking of Lopez's car.

The trial court disagreed, ruling that Barnard's testimony was not relevant to any issue at trial, including the defense of duress. The evidence merely dealt with [Vlasov's] motivation, which was not relevant to specific intent. Furthermore, the court ruled, even if the evidence had some marginal relevance, its probative value was outweighed by its prejudicial effect under Evidence Code section 352. [Vlasov] contends the trial court should not have excluded Barnard's testimony regarding traumatic bonding. In [Vlasov's] view, the testimony was critical in helping the jury in determining "whether defendant actually formed the intent to steal and the other mental states in issue." He analogizes his situation to cases involving rape accommodation syndrome or battered women's syndrome, claiming the expert testimony was necessary to explain [Vlasov's] actions and to help the jury understand his behavior. According to [Vlasov], he could not establish his duress defense without Barnard's testimony; therefore, the court's ruling "undercut the evidentiary basis" of his "main line of defense." The contention fails.

The problem is that Barnard's testimony was irrelevant absent some evidence of a viable duress defense. As explained in part II, ante, [Vlasov] presented no evidence that he actually feared for his life if he did not follow Zhuk's orders, which was a prerequisite to establishing the defense of duress. Barnard's testimony did not, and could not, supply this missing element. For example, in cases involving what is called battered women's syndrome, expert testimony about the syndrome is "admissible to explain how the [Vlasov's] asserted subjective perception of a need to defend herself 'would reasonably follow from the [Vlasov's] experience as a battered woman' [citation], [but] an expert is not permitted to testify as to the expert's opinion that the [Vlasov] actually perceived that she was in danger and needed to defend herself [citation]." (*People v. Erickson* (1997) 57 Cal.App.4th 1391, 1400, italics omitted.)

Hence, Barnard's testimony that traumatic bonding explained [Vlasov's] decision to follow Zhuk's directive to steal the cars had no relevance to the issues at trial. That [Vlasov] may have felt a non-life-threatening coercion to comply with Zhuk's commands did not tend to establish that he acted under duress, which means it did not tend to establish that he acted without the requisite specific intent. At best, Barnard's testimony would have helped to establish a claim of imperfect duress; but California law has rejected application of the doctrine of imperfect duress to negate the specific intent element of a crime. (*People v. Bacigalupo*, *supra*, 1 Cal.4th at p. 126, fn. 4; *People v. Son* (2000) 79 Cal.App.4th 224, 236-237; *People v. Kearns* (1997) 55 Cal.App.4th 1128, 1137; *People v. King* (1991) 1 Cal.App.4th 288, 297- 299.)

For the reasons stated above, the trial court did not abuse its discretion in excluding Barnard's testimony on the ground that it was not relevant to any disputed issue pertaining to the charged crimes.

It is well settled that, under the Sixth Amendment, an accused has the right to present witnesses, testimony and other evidence in his defense. However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."[19] However, this right is abridged by rules of evidence that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes the rules are designed to serve.[20] States have considerable latitude under the Constitution to establish rules excluding evidence from criminal trials.[21] "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate."[22] In considering whether the exclusion of evidence violates due process, this Court must consider the probative value of the evidence on the central issue.[23] Finally, assuming exclusion was error, it is subject to harmless-error analysis.[24]

---

[19] *Taylor v. Illinois*, 484 U.S. 400, 409-10 (1988).

[20] *Id.*

[21] *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).

[22] *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff,* 518 U.S. 37, 42-43 (1996) (plurality opinion) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

[23] *United States v. Cruz-Escoto*, 476 F.3d 1081, 1088 (9th Cir. 2007).

[24] *Neder v. United States*, 527 U.S. 1, 18 (1999).

To the extent that Vlasov raises issues of the proper application of State law, they are beyond the purview of this Court in a federal habeas proceeding. It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.[25] A principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."[26] This principle applied to federal habeas review of state convictions long before AEDPA.[27] A federal court errs if it interprets a state legal doctrine in a manner that directly conflicts with the state supreme court's interpretation of the law.[28] It does not matter that the state supreme court's statement of the law was dictum if it is perfectly clear and unambiguous.[29]

---

[25] *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (it is presumed that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Engle v. Isaac*, 456 U.S. 107, 119 (1982) (challenging the correctness of the application of state law does not allege a deprivation of federal rights sufficient for habeas relief); *Bell v. Cone,* 543 U.S. 447, 455 (2005) (a federal court may not lightly presume that a state court failed to apply its own law).

[26] *Bradshaw v. Richey,* 546 U.S. 74, 76, (2005); *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law. . . .").

[27] *See Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law").

[28] *See Bradshaw*, 546 U.S. at 76–78 ("Because the Sixth Circuit disregarded the Ohio Supreme Court's authoritative interpretation of Ohio law, its ruling on sufficiency of the evidence was erroneous.").

[29] *Id.* at 76.

A determination of state law by a state intermediate appellate court is also binding in a federal habeas action.[30]  This is especially true where the highest court in the state has denied review of the lower court's decision.[31]

A petitioner may not transform a state-law issue into a federal one by simply asserting a violation of due process.[32]  Nor may a federal court issue a habeas writ based upon a perceived error of state law, unless the error is sufficiently egregious to amount to a denial of due process under the Fourteenth Amendment.[33]  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."[34] Vlasov's claim to this Court constitutes a state-law claim, i.e., that the California courts erroneously applied state evidentiary law to his case.  Accordingly, because the California Court of Appeals held that Vlasov's claim was without merit, and he has failed to show an error of constitutional magnitude, his claim is beyond the purview of this Court.

Even if this Court were to reach the merits of this issue, Vlasov would not prevail.  In his petition, Vlasov admits that he killed Ms. Chung in the course of carjacking her, and the only disputed matter at trial was whether he formed the requisite specific intent for felony murder.[35]

---

[30] *See Hicks v. Feiock,* 485 U.S. 624, 629-30 & n.3 (1988) (noting state appellate court's determination of state law is binding and must be given deference).

[31] *Id.*; *see also West,* 311 U.S. at 237 ("This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court.").

[32] *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996).

[33] *See Pulley v. Harris*, 465 U.S. 37, 41 (1984) (dictum).

[34] *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (internal quotations omitted); *see Wainwright v. Goode*, 464 U.S. 78, 86 (1983) (per curiam).

[35]  Under California law, felony murder in the first degree is defined as follows: "[t]he unlawful killing of a human being, whether intentional, unintentional, or accidental, which

Certainly, the testimony regarding "traumatic bonding" was relevant to his motivation for committing the murder, however his motivation for committing the murder was only relevant to the case if it tended to negate the conclusion that Vlasov did not specifically intend to carjack Ms. Chung.[36] Vlasov essentially argues that his relationship with Zhuk motivated him to commit a crime that he otherwise would not have. However, the evidence of "traumatic bonding" showed *why* Vlasov formed the specific intent to carjack Ms. Chung, not that he had failed to form it. This argument defeats itself because it necessarily concedes that Vlasov formed the intent to carjack Ms. Chung, but attempts to justify the formation of the specific intent as the result of another's influence.

---

occurs as a result of the commission of or an attempt to commit the crime of robbery, and where there was in the mind of the perpetrator the specific intent to commit such crime . . . ." California Jury Instruction Criminal No. 8.21. Thus, the required intent for felony murder is simply the specific intent required to commit the underlying felony and no intent to kill need be found for a felony-murder, special circumstance. *See People v. Hart*, 976 P.2d 683, 721 (Cal. 1999); *People v. Anderson*, 742 P.2d 1306, 1331 (Cal. 1987) (superceded by statute on another point). Vlasov's mental state with respect to the killing of Ms. Chung was, therefore irrelevant. Since Vlasov admitted to carjacking Ms. Chung, the only issue at trial was whether he had the specific intent to commit the carjacking.

[36] "Motive, intent, and malice . . . are separate and disparate mental states. The words are not synonyms." *People v. Snead*, 24 Cal.Rptr.2d 922, 927 (Cal. App. 1993). "Motive describes the reason a person chooses to commit a crime. The reason, however, is different than a required mental state such as intent or malice." *People v. Hillhouse*, 40 P.3d 754, 777 (Cal. 2002). However, evidence of a motive that also had the effect of negating the specific intent to commit a crime would be relevant. This is the basis for the defense of duress–an individual is motivated to commit a crime by a threat on his or her life; the law allows this motive, if substantiated, to negate the specific intent of the defendant to commit the crime charged. *People v. Petznick*, (2003) 114 Cal.App.4th 663, 676. In this case, because Vlasov was unable to show that he subjectively feared for his life if he did not commit the carjacking, he was unable to show duress. (See discussion of this *infra*) Nor, could Dr. Barnard have testified that she felt Vlasov indeed did fear for his life. *See People v. Killebrew*, 126 Cal.Rptr.2d 876, 886-87 (Cal. App. 2002) (improper for expert to testify to individual's subjective knowledge and intent; such opinion does nothing more than inform jury how expert believed case should be decided). Thus, Vlasov would have been unable to use her testimony to establish a duress defense. Because his motive was not sufficient to negate his specific intent, it was irrelevant.

The testimony concerning "traumatic bonding" was also not relevant to support a defense of duress. Duress is a defense against criminal charges only when the person charged "committed the act or made the omission charged under threats or menaces sufficient to show that [he] had reasonable cause to and did believe [his life] would be endangered if [he] refused." The defense negates the intent or capacity to commit the charged crime.[37] Although duress is not a defense to murder, it can provide a defense to murder on a felony-murder theory by negating the underlying felony.[38] The theory is, "[i]f one is not guilty of the underlying felony due to duress, one cannot be guilty of felony murder based on that felony."[39] As the California Court of Appeals noted, absent some evidence that Vlasov actually feared for his life if he did not follow Zhuk's orders,[40] there was no viable defense of duress, and therefore, no need for Dr. Barnard's testimony regarding "traumatic bonding" to support such a defense. The testimony was also not relevant to support a defense of imperfect duress,[41] because California has held that "imperfect" duress, cannot be applied to negate a crime's element of specific intent.[42]

---

[37] *Petznick*, 7 Cal. Rptr.3d at 735.

[38] *People v. Anderson*, 50 P.3d 8, 376-78 (Cal. 2002).

[39] *Id.*

[40] There was no evidence that Vlasov subjectively believed he should fear for his life, a California requirement for the defense of duress. Indeed, he admitted he was only "a little afraid."

[41] Imperfect duress is a defense whereby a defendant negates the element of specific intent to commit a crime because he honestly, but unreasonably, believed that his life would be endangered if he did not commit the crime. *People v. Son*, (2000) 93 Cal.Rptr.2d 871, 876-78.

[42] As *Son* notes: Apparently no court has ever actually held in a published decision that the defense of "imperfect duress" in fact exists under California law, even though this nebulous concept finds some indirect support in dicta or by forced analogy to the holdings of other cases. *Id.* at 881.

Finally, Vlasov's claim is without merit because the Supreme Court has never held that California Evidence Code Section 352,[43] the rule relied on by the trial court to exclude Dr. Barnard's testimony, infringes upon a weighty interest of a criminal defendant. *Holmes v. South Carolina*, 547 U.S. 319 (2006), is instructive on this issue. In *Holmes* the court held:

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.[44]

*Holmes* then cited to Federal Rule of Evidence 403 as an example of such a rule.[45] The text of Federal Rule of Evidence 403 is virtually identical in substance to the text of California Evidence Code Section 352. Accordingly, the trial judge's rejection of Dr. Barnard's testimony under California Evidence Code Section 352, after weighing the relevant factors, was not contrary to nor an unreasonable application of *Holmes* and its progeny. Vlasov's first claim is without merit.

Trial Court Erred by Not Instructing the Jury on Duress

In Vlasov's second ground, he claims that the trial court erred by failing to instruct the jury on the defense of duress. Vlasov's presents an issue of purely state law, i.e., the California

---

[43] Cal. Evid. Code Sec. 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[44] *Holmes*, 547 U.S. at 326; *see Moses v. Payne*, 555 F.3d 742, 758 (9th Cir. 2009) (Holding that a Washington Rule of Evidence that allowed the trial judge to balance factors and exercise his or her discretion when deciding the admissibility of expert testimony was a "well established rule of evidence.").

[45] *Id.* Federal Rule of Evidence 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Courts misapplied California law regarding state jury instructions.  Issues of state law are beyond the purview of this Court.  Although Vlasov claims that this alleged error violated his right to due process, a petitioner may not transform a state-law issue into a federal one by simply asserting a violation of due process.[46]  Nor may a federal court issue a habeas writ based upon a perceived error of state law, unless the error is sufficiently egregious to amount to a denial of due process under the Fourteenth Amendment.[47]  The California Court of Appeals ruled that, under California law, Vlasov did not make a showing sufficient to warrant an instruction on duress and the California Supreme Court denied review.  This Court is bound by those determinations.[48]  Because Vlasov has failed to raise a constitutional issue, his claim is without merit.

     Even if this Court were to reach the merits of this issue, Vlasov would not prevail.  As discussed in the previous section, California law requires that a defendant claiming duress show that he had a reasonable belief that his life would be endangered if he refused to commit the charged crime.[49]  In this case, the defense put on no evidence that Vlasov feared for his life if he did not obey Zhuk's instruction to carjack Ms. Chung.  In fact, the California Court of Appeals observed that Vlasov testified that he was afraid only a "little bit.  Not too much."[50]  Simply put, Vlasov failed to show that he had a subjective fear for his life if he did not participate in the

---

[46] *Langford*, 110 F.3d at 1389.

[47] *See Pulley,* 465 U.S. at 41.

[48] *See Hicks,* 485 U.S. at 629-30 & n.3 (noting state appellate court's determination of state law is binding and must be given deference).

[49] *Petznick*, 114 Cal. App. 4th at 676.

[50] *See* Lodged Doc. No. 1, pp 13-17.

carjacking of Ms. Chung.[51]  Accordingly, because Vlasov has failed to show an error of state law, let alone an error of constitutional magnitude, his second claim is without merit.

<u>The Evidence Was Insufficient to Support a Conviction for Intentionally Discharged a Firearm</u>

In Vlasov's third ground, he claims that the evidence was insufficient as a matter of law to support his conviction for intentionally discharging a firearm.  Vlasov notes that the evidence at trial tended to support the conclusion that the discharge of the firearm was accidental.  He points to the testimony of the prosecution and defense experts who testified that the weapon had a "light trigger pull" and that the discharge could have been accidental.  Vlasov also argues that he was convicted under a theory of felony murder, and a finding that the discharge was accidental would not be inconsistent with the verdict.[52]

As articulated by the Supreme Court in *Jackson v. Virginia*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[53]  This Court must, therefore, determine whether the California court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.[54]  Rather, when "faced with a

---

[51] The California Court of Appeals noted that the evidence suggested that Vlasov may have been reluctant to participate in the carjacking, but that he did so in an effort to please Zhuk.  This was not sufficient to warrant an instruction on duress.  *See* Lodged Doc. No. 1, pp 13-17.

[52] This argument is completely without merit, because the jury made a specific finding that the discharge was intentional.

[53] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. ___, 130 S. Ct. 665, 673 (2010) (reaffirming this standard).

[54] *Jackson*, 443 U.S. at 318-19.

record of historical facts that supports conflicting inferences," this Court "must presume– even if it does not affirmatively appear in the record– that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."[55]

The state appellate court on direct review denied this claim as follows:

> Lastly, [Vlasov] challenges the sufficiency of the evidence to support the section 12022.53, subdivision (d) enhancement for intentionally discharging a firearm resulting in Chung's death. He argues the ballistics evidence showed the weapon had a light trigger pull and could be fired accidentally, which [Vlasov] claimed was what occurred. Given that the jury found him guilty of felony murder, which did not require proof that the shooting was intentional, he contends there was no solid or credible evidence to support the enhancement, only circumstantial evidence.
> "Contrary to what [Vlasov] suggests, the judgment is not subject to reversal on appeal simply because the prosecution relied heavily on circumstantial evidence and because conflicting inferences on matters bearing on guilt could be drawn at trial. Although the jury is required to acquit a criminal [Vlasov] if it finds the evidence susceptible of two reasonable interpretations, one of which favors guilt and the other innocence, it is the jury, not the appellate court, which must be convinced of his guilt beyond a reasonable doubt. [Citation.] We review the entire record in the light most favorable to the judgment and affirm the convictions as long as a rational trier of fact could have found guilt based on the evidence and inferences reasonably drawn therefrom. [Citation.] Such is the case here." (*People v. Millwee* (1998) 18 Cal.4th 96, 132.)
> [Vlasov] admitted he had used the gun on two to four occasions prior to the murder and had fired it into the river. Consequently, he was familiar with the weapon and the degree of force necessary to pull the trigger. In addition, the evidence indicated that to fire a shot, the slide had to be racked back so a cartridge could be discharged, the safety had to be off, and the degree of force necessary to squeeze the trigger was between two and one-quarter or two and one-half pounds (the equivalent of a quart of milk). After the shooting, Zhuk asked [Vlasov] if he had shot the driver. [Vlasov] replied, "yes," and said that he had fired two or three shots into the car. He stated, "I didn't get the car because she wouldn't give it up. She stepped on the gas and I shot her."
> This is substantial evidence supporting the jury's finding that [Vlasov] intentionally shot Chung, rather than accidentally shooting her.[56]

Certainly, there was evidence to support the conclusion that Vlasov discharged the firearm accidentally. However, the prosecution submitted evidence that, although the trigger

---

[55] *Id.* at 326; *see McDaniel*, 130 S. Ct. at 673-74.

[56] Lodged Doc. No 1, pp. 21-22.

was sensitive, Vlasov had handled that particular weapon before, and had discharged it on multiple occasions. Thus, a reasonable jury could conclude that Vlasov was familiar with the weapon's sensitive trigger. The evidence also showed that the slide of the pistol had to have been racked and the safety would have had to be off for the pistol to fire. Finally, Vlasov admitted that he shot Ms. Chung "because she wouldn't give [the car] up."[57] All of this evidence supports a conclusion that Vlasov discharged the firearm intentionally. Given the conflicting evidence on this matter, this Court must presume that the jury resolved any such conflicts in favor of the prosecution, and defer to that resolution."[58] Vlasov is not entitled to relief on his third ground.

## CONCLUSION AND ORDER

Vlasov is not entitled to relief under any ground raised in the Petition. Accordingly,

**IT IS HEREBY ORDERED THAT** the Petition Under 28 U.S.C. § 2241 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[59]

The Clerk of the Court is to enter judgment accordingly.

Dated: January 19, 2011

/s/ James K. Singleton, Jr.
James K. Singleton, Jr.
United States District Judge

---

[57] Lodged Doc. No 1, p. 22.

[58] *Jackson*, 443 U.S. at 326; see *McDaniel*, 130 S. Ct. at 673-74.

[59] See Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.